UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BOBBI JACKSON and
MATTHEW JACKSON,

                                Plaintiffs,

                                Case # 16-CV-787-FPG

v.

                                DECISION AND ORDER

BANK OF AMERICA, N.A.,

                                Defendant.
_____

**INTRODUCTION**

Plaintiffs Bobbi and Matthew Jackson filed a putative class action complaint on September 30, 2016 alleging that their mortgage loan servicer, Defendant Bank of America, improperly and untimely processed their mortgage assistance applications so that it could charge them excessive loan delinquency fees. Specifically, Plaintiffs allege Defendant violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, its implementing regulations, 12 C.F.R. §§ 1024.1-1024.41, and Section 349 of New York's General Business Law ("GBL").

Presently before the Court is Defendant's motion to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF. No. 6. For the reasons stated below, Defendant's motion is granted in part and denied in part.

# BACKGROUND[1]

**I. Facts**

    **A. 2007-2013**

Plaintiffs purchased their home in 2007. Their initial monthly mortgage payment was $609.44, and Defendant subsequently became the servicer of Plaintiffs' mortgage. In 2009, Plaintiffs fell behind on their mortgage payments after Plaintiff Matthew Jackson's employer laid him off. In 2010, after Mr. Jackson found a new job, Plaintiffs attempted to make partial payments on the overdue amount they owed Defendant. Defendant rejected the partial payments, demanding instead that Plaintiffs pay the overdue amount in a single lump sum or face foreclosure. Plaintiffs could not afford to pay a lump sum, and repeatedly requested mortgage assistance from Defendant. Defendant rejected the requests, informing Plaintiffs that it was missing information from them, even though Plaintiffs had already submitted the information Defendant claimed it was missing.

Because Defendant would not grant Plaintiffs mortgage assistance and rejected Plaintiffs' partial payments, the outstanding amount Plaintiffs owed on their mortgage continued to grow, and Defendant assessed late fees, property inspection fees, fees for mortgage insurance and other charges to the balance of what the Jacksons owed.

    **B. January 28, 2014-December 20, 2014**

At the beginning of 2014, regulations[2] requiring servicers to comply with certain procedures when processing borrowers' mortgage assistance applications went into effect. Plaintiffs subsequently applied for mortgage assistance on January 28, 2014. On January 30, Defendant acknowledged receipt of Plaintiffs' application.

---

[1] The following allegations are taken from Plaintiff's complaint (ECF No. 1) and are accepted as true for the purpose of evaluating Bank of America's motion to dismiss.

[2] Plaintiffs are suing under these regulations, 12 C.F.R. § 1024.41.

On February 1, Defendant sent Plaintiffs a letter claiming that it could not complete its review because it needed copies of IRS Form 4506-T, which would allow Defendant to request a transcript of Plaintiffs' tax return. It also requested a copy of a social security award letter or benefits letter. The Plaintiffs, however, had already submitted copies of both of these documents with their initial application package. Defendant's letter also asked Plaintiffs to provide copies of their tax returns, even though Defendant did not require the Plaintiffs to submit their tax returns with their initial application. Finally, the letter asked for copies of bank account statements from Plaintiff Bobbi Jackson, even though Plaintiffs had already provided copies of statements for their joint bank account, which was the only bank account they had.

Defendant sent two additional letters on February 20, 2014 and March 4, 2014 stating that it had received the documentation the Plaintiffs had sent it supporting their request for mortgage assistance, but that Defendant needed all required documentation specified in its "initial notice." The letters did not identify what information was missing. Instead, it instructed the Plaintiffs to refer back to their initial application package or to Defendant's website to see which documents Defendant had received. The website, however, did not specify which documents were missing—it provided only a generic list of all documents a borrower may need to complete their application.

On March 5, Defendant again asked for Ms. Jackson's bank statements, even though Plaintiffs had already provided statements for their joint bank account. Defendant next sent Plaintiffs two identical letters dated March 13 and March 25 stating it had received the documentation supporting their request for mortgage assistance and referring them back to their initial application package or Defendant's website to determine if any information was still missing.

Defendant sent Plaintiffs a letter on April 12, 2014, again asking them to provide an IRS Form 4506-T and copies of their tax returns—both of which Plaintiffs had already provided on numerous occasions. It also asked for copies of Mr. Jackson's pay stubs that Jacksons had already submitted. On April 15, Defendant sent another identical letter to Plaintiffs.

On May 20, Defendant sent Plaintiffs a letter asking them to submit another copy of their initial mortgage assistance application because the required hardship affidavit—a statement explaining why Plaintiffs were seeking mortgage assistance—was allegedly missing from their original January 28 application. The Plaintiffs had not written the hardship explanation in the correct spot of the application, and hadn't provided enough information about why the needed mortgage assistance. The Plaintiffs then resubmitted their application, this time with the requested hardship affidavit in the correct format, and Defendant acknowledged receipt on May 22 and June 6, 2014.

After all this, Defendant sent Plaintiffs a letter on June 28, 2014 stating that it had not received the documentation requested in its May 20, 2014 letter, and informed Plaintiffs that it was no longer reviewing their application.

Fearing foreclosure, Plaintiffs had no choice but to submit another application for mortgage assistance in August 2014. While the Plaintiffs experienced the same communication issues with Defendant that they experienced months earlier, this time they were successful in receiving a loan modification. On September 9, 2014, Defendant approved the Plaintiffs for a trial period payment plan under the Federal Housing Administration's Home Affordable Modification Program (FHA-HAMP), but denied them for other mortgage assistance programs.

Finally, on December 20, 2014, Defendant notified Plaintiffs that they had completed their trial period payment plan, and had therefore qualified for a permanent loan modification.

4

However, under the terms of their loan modification agreement, their monthly principal and interest payment increased from $609.44 to $712.44. In addition, Defendant increased Plaintiff's total unpaid principal balance from $90,347.53 to $142,691.86. Defendant claimed there was a total delinquency amount of $52,676.87, which was composed primarily of delinquent interest that the Jacksons were unable to pay because Defendant had been rejecting their payments, as well as an additional $3,559.00 in unspecified fees.

### C. October 2015-March 17, 2016

Plaintiffs followed their new loan modification agreement for a few months, but fell behind when Mr. Jackson's employer changed his salary payment schedule. On October 18, 2015, Plaintiffs again applied for mortgage assistance. Once more, Defendant requested information that Plaintiffs had already provided to Defendant, and sent generic form letters saying that Plaintiffs' application was incomplete. This pattern continued until January 29, 2016, when Defendant filed a foreclosure lawsuit against Plaintiffs, while Defendant was purportedly reviewing Plaintiffs' application. Defendant then encouraged Plaintiffs to send yet another loss mitigation application. They complied. Finally, Defendant approved Plaintiffs for an FHA Formal Forbearance plan in March of 2016. They next day, Defendant sent Plaintiffs a bill for $9,906.70 in unspecified fees and charges.

Plaintiffs' experience with Defendant is not unique—the Consumer Financial Protection Bureau (CFPB) "has received hundreds of complaints from consumers with regard to" Defendant's "mishandling of loan modification applications." ECF No. 1 at 6. Plaintiffs' pleadings highlighted five of these complaints, which detailed frustrations similar to Plaintiffs' about Bank of America's confusing and conflicting correspondence with borrowers. ECF No. 1 at 7.

## II. Regulatory Background

After the 2008 recession, mortgage loan servicers such as Bank of America struggled to handle the increase in delinquent loans, mortgage modification requests, and foreclosures they were required to process. ECF. No. 1 at 11. Servicers were either too overwhelmed to timely process mortgage assistance applications, or in some instances, unwilling to. Because servicers earn revenue from "fees assessed on borrowers, such as late fees," servicers had every incentive to delay the loss mitigation application process. *Id.* In one case, former Bank of America employees stated that they were "instructed that their job was to maximize fees for BofA by delaying and refusing to process loss mitigation applications," and were instructed to "tell borrowers that their loss mitigation applications were under review, even though that was not the case or to falsely claim that documents were incomplete or missing." ECF No. 1 at 3.

In an effort to help borrowers seeking mortgage assistance, the CFPB issued final rules under RESPA requiring servicers to follow strict procedures and deadlines for processing mortgage assistance applications and disclosing important information to borrowers about the status of their application. *See* 12 C.F.R. § 1024.41. Section 6(f) of RESPA gives borrowers a private right of action against servicers that fail to comply with any portion of 12 C.F.R. § 1024.41. ECF No. 1 at 17. Borrowers can recover actual damages, as well as statutory damages in the event that a servicer demonstrates a "pattern or practice" of noncompliance with the rules. *Id.* These rules became effective on January 10, 2014. *Id.*

## DISCUSSION

### I. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

12(b)(6). In reviewing a motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## II.  RESPA Claims

### A.  October 2015-March 17, 2016

Plaintiffs allege that Defendant committed numerous RESPA violations between January 2014 and March 2016. The pertinent RESPA rule states that a "servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's loan account." 12 C.F.R. § 1024.41(i). In other words, servicers are not "required to comply with the requirements of . . . § 1024.41 if a borrower had previously been evaluated for loss mitigation options for the borrower's mortgage loan account by that servicer." 78 Fed. Reg. 10696, 10836 (Feb. 14, 2013). This rule prioritizes first-time mortgage assistance applicants over applicants who were already granted mortgage assistance. *See id.*

Defendant evaluated Plaintiffs for mortgage assistance based on their complete August 2014 application, so Defendant was not required to follow Section 1024.41's requirements on any subsequent applications. As a result, the Section 1024.41 claims based on events occurring between October 2015-March 17, 2016 are dismissed, as they occurred after Plaintiffs submitted

7

a "single complete" application. Only the period of January-September 2014 is relevant to this litigation.

B.     **January 2014-June 2014**

Plaintiffs raise several arguments under Section 1024.41(b), which instructs servicers to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1). Specifically, "promptly upon receipt of a loss mitigation application," the servicer must "review the loss mitigation application to determine if the loss mitigation application is complete." *Id.* at § 1024.41(b)(2)(i)(A). Servicers must notify borrowers of their determination within five days[3] of receiving an application, and if an application is incomplete, let the borrower know the "additional documents and information the borrower must submit to make the loss mitigation application complete." *Id.*

Plaintiffs have sufficiently alleged that Defendant violated Section 1024.41(b) in handling Plaintiffs' initial application for mortgage assistance.[4] From the time Plaintiffs submitted their application in January 2014 to Defendant's rejection of that application as incomplete in June 2014, Defendant repeatedly asked Plaintiffs for documents, such as tax returns and social security letters, that they had already submitted. Defendant also repeatedly notified Plaintiffs that their

---

[3] Plaintiffs misconstrue the five day notification requirement by arguing that servicers must acknowledge receipt of an application and deem it complete or incomplete in the same letter. The plain language of Section 1024.41(b)(2) does not support Plaintiffs' reading, so Defendant did not violate Section 1024.41(b)(2) by acknowledging receipt of Plaintiffs' application in one letter and determining that their application was incomplete in another letter. *See* 12 C.F.R. § 1024.41(b)(2).

[4] Defendant argues that because Plaintiffs never specifically referenced Section 1024.41(b)(1) in their complaint, the Court can disregard Plaintiffs' argument in their brief opposing Defendant's motion to dismiss that Defendant "violated Section 1024.41(b) by failing to exercise reasonable diligence in obtaining documents." ECF No. 12 at 4 (quoting ECF No. 11 at 9). It is true that a "complaint cannot be amended by the briefs in opposition to a motion to dismiss," *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015), but Plaintiffs did reference Section 1024.41(b) as a whole in their complaint. *See* ECF No. 1 at 24, 29, 33. Even if the complaint did not specifically use the "reasonable diligence" language of Section 1024.41(b)(1), that provision merely supplements Section 1024.41(b)(2)'s five day notification requirement. That is, servicers exercise reasonable diligence under Section 1024.41(b)(1) by complying with the procedures described in Section 1024.41(b)(2). Because Plaintiffs were not using their brief to amend their complaint, the Court will not disregard Plaintiffs' argument that Defendants failed to use reasonable diligence.

application was incomplete, without specifying which documents the Defendant was missing, in plain violation of Section 1024.41. While Defendant referred Plaintiffs to its website to determine which documents were missing, the website merely listed documents that any borrower may need to submit to make their application complete, regardless of whether the borrower had already submitted those documents or "whether the documents were even pertinent to a specific borrower's financial situation." ECF No. 1 at 26. And since Defendant kept asking Plaintiffs for documents they had already submitted, they had no way of knowing which documents, if any, Defendant actually still needed from Plaintiffs.

Defendant counters that it was appropriate to repeatedly ask Plaintiffs for documents they had already submitted, because "servicers need the 'most recent' versions of these documents" when assessing borrowers' mortgage assistance applications. ECF No. 6-1 at 3. But Defendant "was not asking for more recent versions of documents it already had—it was claiming the Jacksons had not submitted" them at all. ECF No. 11 at 10. Furthermore, many of the documents Defendant asked the Plaintiffs to resubmit, such as their tax returns, are not documents that need to be updated. *Id.* at 11.

The parties also disagree about whether Plaintiffs' hardship affidavit was missing from their initial January 2014 application. It was reasonable for Defendant to deem the affidavit missing, as Plaintiffs did not write it in the correct spot of the application, and it did not contain enough information.[5] But it was not necessarily reasonable for Defendant to wait nearly four months before notifying Plaintiffs that they needed to submit a new hardship affidavit. Indeed, Section 1024.41(b) required Defendant to notify Plaintiffs within five days of receiving their

---

[5] *See* ECF No. 7-3. Although Defendant provided a copy of Plaintiffs' defective hardship affidavit, the Court may still examine it when resolving this motion to dismiss because it is "integral" to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (explaining that when a complaint relies heavily upon a document, the document is integral to the complaint and thus subject to the court's consideration on a motion to dismiss).

application. There is an exception to this rule if a servicer "later discovers additional information or corrections to a previously submitted document," 12 C.F.R. § 1024.41(c)(2)(iv), but it is not clear why Defendant took so long to discover that the hardship affidavit was insufficient—particularly when that insufficiency was readily apparent from Plaintiffs' January 2014 application.

The regulations required Defendant to "exercise reasonable diligence in obtaining documents and information to complete" Plaintiffs' mortgage assistance application, 12 C.F.R. § 1024.41(b)(1), but Defendant's confusing, conflicting and belated communications to Plaintiffs frustrated and ultimately thwarted their first attempt to receive mortgage assistance. While discovery may eventually discredit Plaintiffs' allegations against Defendant, the Court must credit these allegations at the pleadings stage. *See Dionne v. Fed. Nat'l Morg. Assn.,* 110 F. Supp. 3d 338, 343 (D.N.H. 2015) (crediting the plaintiff's allegations that defendant mortgage servicer repeatedly asked plaintiff to submit documents that defendant had already received).

      **i.**      **Actual Damages**

To receive actual damages[6] under RESPA, Plaintiffs must allege that "damages were proximately caused by the [D]efendant's violation of the statute." *Gorbaty v. Wells Fargo Bank, N.A.*, 2012 WL 1372260, at *5 (E.D.N.Y. Apr. 18, 2012). Defendant argues that because it ultimately gave Plaintiffs a loan modification, Defendant's alleged RESPA violation did not harm them. While Defendant did eventually give Plaintiffs mortgage assistance in September of 2014 that was nearly eight months after Plaintiffs initially applied for mortgage assistance in January 2014. For the first half of 2014, Defendant kept Plaintiffs in default by simultaneously rejecting

---

[6] In addition to actual damages, Plaintiffs ask for injunctive relief. ECF No. 1 at 41. No court has recognized a private right to injunctive relief under RESPA, *e.g., Minter v. Wells Fargo Bank, N.A.*, F. Supp. 2d 788, 796 (D. Md. 2009), so the Court declines to do so now.

their mortgage payments and refusing to accept Plaintiffs' application for mortgage assistance. And because Plaintiffs remained in default, Defendant "continued to assess various" delinquency fees "to the balance of their loan." ECF No. 1 at 2.[7] Plaintiffs have plausibly alleged that, had Defendant complied with RESPA, Plaintiffs would have been approved for a modification earlier, and would owe Defendant less in fees.

Defendant counters that those fees do not constitute damages, because Plaintiffs were "*years* behind on their monthly payments" and "could not possibly have paid a penny of those fees." ECF No. 12 at 9. Whether Plaintiffs have actually paid those fees is irrelevant to the damages analysis. Numerous courts have held that assessed fees can constitute damages under RESPA, even if Plaintiff has not paid them. *See, e.g.*, *Claude v. Wells Fargo Home Mortg.*, No. 3:13-CV-00535, 2014 WL 4073215, at *5 (D. Conn. Aug. 14, 2014) ("the servicer wrongfully imposed late fees"); *Allen v. Bank of Amer. Corp.*, No. CCB-11-33, 2011 WL 3654451, at *5 (D. Md. Aug. 18, 2011) (plaintiffs stated claim under RESPA for improper "imposition" of late fees). Even if the delinquency fees constituted a small amount of Plaintiffs' total unpaid principal balance, they are still actual damages under RESPA.

In addition to late fees, Plaintiffs allege they incurred administrative costs "such as postage, photocopying, scanning, and travel expenses that they would not have incurred if" Defendant had complied with RESPA, as well as "lost time and inconvenience" and a "ruined credit score." ECF No. 11 at 18-19. Many courts have held that these sorts of damages are recoverable under RESPA. *E.g., McCray v. Fed. Home Loan Mortg. Corp.,* No. 13-1518, 2014 WL 293535, at *14 (D. Md. Jan. 24, 2014) (stating that expenses including sending certified mail, traveling to and from the post office, copying documents, and researching information are recoverable under RESPA);

---

[7] In December 2014, Defendant increased the Plaintiffs' total unpaid principal balance by $52,676.87, which included $3,559.00 in fees. ECF No. 1 at 31.

*Marais v. Chase Home Fin., LLC*, 24. F. Supp. 3d 712, 728 (S.D. Ohio 2014) (stating that actual damages under RESPA include losses resulting from damaged credit). Plaintiffs will have to substantiate these allegations moving forward, but Plaintiffs have satisfied their initial burden to plausibly allege damages at the pleadings stage.

### ii. Statutory Damages

To obtain statutory damages[8] under RESPA, Plaintiffs must establish that Defendant has a "pattern or practice of noncompliance" with the statute. *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 445 (E.D.N.Y. 2013). There is no "magic number of violations that create a" pattern or practice of noncompliance, but another court in the Second Circuit has stated that more than two violations of RESPA are sufficient to support a claim for statutory damages. *Id.* at 449. Additionally, allegations that a servicer violated RESPA in servicing a class of similarly situated individuals also support a finding of a pattern or practice of noncompliance. *Id.*

Plaintiffs allege a sufficient number of Section 1024.41(b) violations to establish that Defendant had a pattern or practice of not complying with the statute. They allege that hundreds of consumers like Plaintiffs complained to the CFPB about Defendant's mishandling of their mortgage assistance applications, and share five of these grievances in detail in their complaint. At the pleadings stage, these allegations are sufficient to establish that Defendant violated RESPA in servicing a class of similarly situated individuals.

### C. June-September 2014

Plaintiffs accuse Defendant of violating other provisions of RESPA several times between June 28, 2014 and September 9, 2014, but none of these allegations withstand Defendant's motion to dismiss. First, Plaintiffs allege that Defendant's June 28 letter rejecting Plaintiffs' January 2014

---

[8] Plaintiffs may recover up to $1,000 in statutory damages for each RESPA violation. 12 U.S.C. § 2605(f)(1).

application as incomplete violated Section 1024.41(c), which requires servicers to provide borrowers written notification of "the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage," and the borrower's right to appeal that decision. 12 C.F.R. § 1024.41(c)(1)(ii). But this regulation only applies to applications the servicer has determined to be complete,[9] and Defendant determined that Plaintiffs' January application was incomplete. Furthermore, the regulations give Defendant the right to "establish its own application requirements" and decide what information it "requires from [the] borrower." 12 C.F.R. §. 1024.41(b)(1) & sup. I, cmt. 1. As discussed earlier, Defendant may have hampered Plaintiffs' efforts to complete their application in violation of Section 1024.41(b), but that has no bearing on the completeness of Plaintiffs' application for the purposes of Section 1024.41(c).

Plaintiffs next[10] take issue with Defendant's response to their second application for mortgage assistance, which they sent Defendant on August 4, 2014. Defendant approved this application for a trial period payment plan under FHA-HAMP on September 9, 2014, but Plaintiffs allege that Defendant's approval letter did not comply with Section 1024.41(d). Under that section, if a borrower's application "is denied for any trial or permanent loan modification option available to the borrower," the servicer must state "the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option." 12 C.F.R. § 1024.41(d). Plaintiffs allege that Defendant's approval letter did "not explain the reasons why the Jacksons qualified for the FHA-HAMP program," nor did it "explain the specific reasons why the Jacksons

---

[9] *See* 12 C.F.R. § 1024.41(c)(1) ("if a servicer receives a complete loss mitigation application . . .").
[10] Plaintiffs also allege Defendant violated § 1024.41(b)(2) by failing to confirm receipt of the application for mortgage assistance that they sent on August 4, 2014 within five days. However, servicers have five days from the date they *receive* an application to confirm its receipt, and Plaintiffs never state when Defendant received their application. ECF No. 6-1 at 12. This allegation is therefore easily dismissed.

were denied other loan modification options," such as an FHA Special Forbearance or FHA Formal Forbearance. ECF No. 1 at 30.

However, Defendant provided a copy[11] of its September 9 letter to Plaintiffs, and it does in fact comply with RESPA. First, the plain language of Section 1024.41(d) does not require a servicer to explain to a borrower why it offered him any particular modification. Defendant was thus not obligated to explain why it approved the Jacksons for the FHA-HAMP program. *See* 12 C.F.R. § 1024.41(d)  Second, in its letter, Defendant gave very specific, income-based reasons why it denied the Jacksons for FHA Formal Forbearance. ECF No. 7-4 at 7. Even if it had not, the regulation only requires servicers to provide specific reasons why the borrower was "denied a trial or permanent loan modification option, not all loss mitigation options." *Lee v. Mortg. Ctr., LLC*, 2015 WL 12681314, at *3 (E.D. Mich. May 22, 2015). FHA Formal Forbearance and FHA Special Forbearance are loss mitigation options, but they are not trial or permanent loan modifications, so the Defendant did not need to explain its reasons for denying Plaintiffs for those programs.[12]

## III.   N.Y. Gen. Bus. Law § 349

Plaintiffs also claim Defendant violated Section 349 of New York's General Business Law ("GBL"), which prohibits "deceptive acts or practices" in business. N.Y. Gen. Bus. Law § 349(a) (McKinney 2017).  To state a claim under the law, Plaintiffs must plausibly allege that: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). The "gravamen of such a claim is that the offending conduct be directed against

---

[11] Even though Defendant provided this letter, the Court may examine it when resolving this motion to dismiss because it is "integral" to the complaint. *See Chambers*, 282 F.3d at 153.
[12] Plaintiffs also complain that the mortgage assistance they eventually received was inadequate, but "nothing in section 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option." 12 C.F.R. §. 1024.41(a).

14

the consuming public" at large, and not a "single-shot transaction." *Silverman v. Household Fin. Realty Corp.*, 979 F. Supp. 2d 313, 317 (E.D.N.Y. 2013). Where a plaintiff merely "makes conclusory allegations about misrepresentations affecting consumers generally, a Section 349 claim must be dismissed." *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 536 (E.D.N.Y. 2015).

Plaintiffs' accusations concerning the GBL are conclusory. Plaintiffs allege Defendant violated the GBL by "offering loss mitigation options to consumers without intending to provide them as offered," refusing "to process consumers' loss mitigation applications in a manner that will ensure fair review," and by "improperly assessing various fees on borrowers while their loss mitigation application is under review." ECF No. 1 at 20. Missing from these accusations is any well-pled allegation that Defendant deceived or mislead Plaintiffs and the public at large. If anything, the facts in the complaint belie the first GBL claim that Defendant never intended to provide mortgage assistance to Plaintiffs: Defendant did provide loss mitigation options to Plaintiffs, and nowhere do Plaintiffs claim that what they received differed from the terms offered.

Plaintiff's second GBL claim that Defendant refused to "process consumers' loss mitigation applications in a manner that will ensure fair review" fails to plead deception or misrepresentation. Plaintiffs do not describe any misleading statements from Defendant about how they would fairly process borrowers' applications from which Defendant deviated in practice.

The third GBL claim related to improper fees fails for similar reasons. While Plaintiffs stress that New York courts have approved GBL claims in instances where consumers were charged improper fees, ECF No.11 at 23, in those cases, plaintiffs linked the issue of fees to misleading or deceptive statements. Plaintiffs have demonstrated no such nexus between misleading statements and improper fees in this case.

Because Plaintiffs have not plausibly alleged that Defendant mislead or deceived them, the Court dismisses Plaintiffs' claims under the GBL.

## IV. Amending the Complaint

Plaintiffs ask that, in the event the Court deems their claims to be inadequately pleaded, they be given leave to file an amended complaint to cure any pleading deficiencies. The Court grants this request, as "the court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Defendant's Motion is DENIED with respect to Plaintiffs' 1024.41(b) claims for actual and statutory damages resulting from Defendant's processing of their January 2014 application. Defendant's Motion is GRANTED with respect to all of Plaintiffs' remaining RESPA claims, as well as their New York GBL claim.

By separate order, this case will be referred to a United States Magistrate Judge for pretrial proceedings. Defendant must serve its answer to Plaintiffs' complaint by December 5, 2017. Fed. R. Civ. P. 12(a)(4)(A). If Plaintiffs file an amended complaint, Defendant must respond within 14 days after it is served. Fed. R. Civ. P. 15(a)(3).

IT IS SO ORDERED.

Dated: November 21, 2017
      Rochester, New York

                                        HON. FRANK P. GERACI, JR.
                                        Chief Judge
                                        United States District Court