UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Bobbi Jackson and Matthew Jackson,

          Plaintiffs,

  v.

Bank of America, N.A.,

          Defendant.

**Decision and Order**

16-CV-787G

---

## I. INTRODUCTION

When plaintiffs Bobbi Jackson and Matthew Jackson applied for mortgage assistance in January 2014, they expected defendant Bank of America, N.A. (the "Bank") to review the completeness of the application within the time required by federal regulations. Allegedly, the Bank did not do so. Instead, according to the Jacksons, the Bank spent several months telling the Jacksons that their application was incomplete, but without telling them which documents were missing. At the same time, the Bank allegedly kept asking the Jacksons for documents that they already had submitted. The net result of the Bank's conduct, according to the Jacksons, was the need for a second application; the receipt of only partial assistance through that second application; and unnecessary fees and costs along the way.

The Jacksons believe that the Bank treated them the way it regularly treats many other applicants for mortgage assistance. The Jacksons thus filed their complaint (Dkt. No. 1) with eventual class certification in mind. Under the current scheduling order (Dkt. No. 55), the parties have been engaging in discovery related to the anticipated motion for class certification. Certification-related discovery has stalled, though, over a dispute about the scope of production of certain documents and email messages. The dispute prompted the Jacksons to file a non-dispositive

motion to compel under Rule 37 of the Federal Rules of Civil Procedure. (Dkt. No. 37.) In short, while the parties have expressed some general agreement about the need for document production, they cannot agree on whether document production should be limited to the Jacksons' surviving claim. The parties also cannot agree on the proper scope of any search for email messages; the Bank questions whether any email search should be required, given that its employees purportedly do not use email when processing mortgage assistance applications.

Chief Judge Geraci has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 16.) The Court has deemed the pending motion submitted on papers under Rule 78(b). For the reasons below, the Court grants the Jacksons' motion in part.

## II. BACKGROUND

This potential class-action case concerns allegations that the Bank mishandled the Jacksons' attempts at loan modification when they fell behind in their mortgage; the Bank's conduct allegedly sent the Jacksons' home into foreclosure, increased fees that they owed, and violated federal housing regulations in the process. When he issued his Decision and Order addressing the Bank's motion to dismiss, Chief Judge Geraci summarized the core of the Jacksons' factual narrative as follows:

> Plaintiffs purchased their home in 2007. Their initial monthly mortgage payment was $609.44, and Defendant subsequently became the servicer of Plaintiffs' mortgage. In 2009, Plaintiffs fell behind on their mortgage payments after Plaintiff Matthew Jackson's employer laid him off. In 2010, after Mr. Jackson found a new job, Plaintiffs attempted to make partial payments on the overdue amount they owed Defendant. Defendant rejected the partial payments, demanding instead that Plaintiffs pay the overdue amount in a single lump sum or face foreclosure. Plaintiffs could not afford to pay a lump sum, and repeatedly requested mortgage assistance from Defendant. Defendant rejected the requests, informing Plaintiffs that it was missing information from them, even though Plaintiffs had already submitted the information Defendant claimed it was missing.
>
> Because Defendant would not grant Plaintiffs mortgage assistance and rejected Plaintiffs' partial payments, the outstanding amount Plaintiffs owed on their mortgage continued to grow, and Defendant assessed late fees, property inspection

fees, fees for mortgage insurance and other charges to the balance of what the Jacksons owed.

(Dkt. No. 15 at 2.) Of the various claims that the Jacksons asserted in their complaint, Chief Judge Geraci dismissed all of them except for one claim concerning an application for mortgage assistance that the Jacksons submitted to the Bank in January 2014:

> Plaintiffs raise several arguments under Section 1024.41(b), which instructs servicers to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1). Specifically, "promptly upon receipt of a loss mitigation application," the servicer must "review the loss mitigation application to determine if the loss mitigation application is complete." *Id.* at § 1024.41(b)(2)(i)(A). Servicers must notify borrowers of their determination within five days of receiving an application, and if an application is incomplete, let the borrower know the "additional documents and information the borrower must submit to make the loss mitigation application complete." *Id.*
>
> Plaintiffs have sufficiently alleged that Defendant violated Section 1024.41(b) in handling Plaintiffs' initial application for mortgage assistance. From the time Plaintiffs submitted their application in January 2014 to Defendant's rejection of that application as incomplete in June 2014, Defendant repeatedly asked Plaintiffs for documents, such as tax returns and social security letters, that they had already submitted. Defendant also repeatedly notified Plaintiffs that their application was incomplete, without specifying which documents the Defendant was missing, in plain violation of Section 1024.41. While Defendant referred Plaintiffs to its website to determine which documents were missing, the website merely listed documents that any borrower may need to submit to make their application complete, regardless of whether the borrower had already submitted those documents or "whether the documents were even pertinent to a specific borrower's financial situation." ECF No. 1 at 26. And since Defendant kept asking Plaintiffs for documents they had already submitted, they had no way of knowing which documents, if any, Defendant actually still needed from Plaintiffs.
>
> Defendant counters that it was appropriate to repeatedly ask Plaintiffs for documents they had already submitted, because "servicers need the 'most recent' versions of these documents" when assessing borrowers' mortgage assistance applications. ECF No. 6-1 at 3. But Defendant "was not asking for more recent versions of documents it already had—it was claiming the Jacksons had not submitted" them at all. ECF No. 11 at 10. Furthermore, many of the documents Defendant asked the Plaintiffs to resubmit, such as their tax returns, are not documents that need to be updated. *Id.* at 11.

(Dkt. No. 15 at 8–9.) Following a scheduling conference on January 9, 2018, and in accordance with

Local Civil Rule 23(c), the Court issued a scheduling order for certification-related discovery and for the anticipated class certification motion. (Dkt. No. 26.) On February 5, 2018, the Court endorsed a stipulated protective order that would govern discovery. (Dkt. No. 27.)

The Jacksons filed the pending motion to compel on May 15, 2018, after the parties met and conferred on February 12 and March 8, 2018. By the very fact that the Jacksons filed the motion, and that the Bank has opposed it, the Court knows that certification-related discovery has hit a snag. The Court will identify the specific points of contention momentarily. Nonetheless, a few areas of general agreement are apparent. The parties recognize that investigating a potential class will require examining how the Bank receives and conducts initial reviews of applications for mortgage assistance. The parties recognize further that the Bank, to avoid regulatory violations and to ensure uniform practice among its employees, likely has policies and procedures in place governing initial reviews of applications, as well as methods for testing compliance with those policies and procedures. Consequently, the Bank has agreed to produce documents related to "compliance testing" for 12 C.F.R. § 1024.41. (*Compare* Dkt. No. 37-2 at 9 *with* Dkt. No. 40 at 5.) In fact, the Bank asserts that it produced some quantity of documents related to compliance testing on May 30. (Dkt. No. 40 at 5.) The Bank also appears not to be philosophically opposed to producing employee email messages, so long as the parties identify a small number of employees most closely connected to initial reviews of applications, and so long as the parties can agree to a predictive coding protocol that would identify the most relevant documents. (*See* Dkt. No. 40 at 6.)

Unfortunately, the agreements end there. With respect to compliance testing, the Jacksons take the following position on the scope of documentation that the Bank needs to produce:

> Plaintiffs' request for compliance documents is simple: to the extent BOFA engaged in compliance testing for 12 C.F.R. § 1024.41, using either its own employees or outside consultants or auditors, BOFA must produce all reports of such testing. This reasonable and targeted request is in keeping with the

4

> requirements of Rule 26 because it seeks documents obviously relevant to both the issues to be briefed at class certification and the merits of the case, and it is in no way disproportionate to the needs of the case—particularly in light of the "rigorous analysis" Plaintiffs will need to satisfy at the class certification stage, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), and BOFA's vast resources.
>
> The results of BOFA's compliance testing is plainly relevant to Plaintiffs' burden at the class certification stage because it will demonstrate the extent to which BOFA's failures were system-wide. For example, documents showing internal recognition that BOFA repeatedly asked all or many borrowers for documents they had already submitted, and repeatedly sent letters stating that an application was incomplete without specifying which documents were missing, will provide strong evidence of commonality and typicality under Rule 23. *See* Dkt. 15 at 9–10 (discussing Plaintiffs' claims that BOFA did not exercise diligence under 12 C.F.R. § 1024.41(b)(1)). As another example, documents acknowledging that BOFA ordinarily waited months before notifying borrowers what documents were missing from their applications are also probative of commonality and typicality. *See id.* These are just examples, used to demonstrate why, if BOFA's internal compliance and risk management groups conducted any testing or compliance reviews concerning BOFA's compliance with 12 C.F.R. § 1024.41, Plaintiffs are entitled to review the results of such testing. In short, those documents will demonstrate how BOFA treated its borrowers as a class.

(Dkt. No. 37-1 at 11–12.) The Bank responds that it produced "responsive documents" concerning testing within about 70 days of the Jacksons' request. (Dkt. No. 40 at 5.) The Bank also suggests that these responsive documents ran "several thousand pages." (Dkt. No. 40 at 1.) The Bank objects to furnishing compliance testing results beyond those related to the claim by the Jacksons that survived the motion to dismiss:

> The only live dispute with respect to this request concerns its scope. Plaintiffs insist that Bank of America "must produce *all* reports" of its "compliance testing for 12 C.F.R. § 1024.41," whether they relate to Plaintiffs' claims or not. The problem with this insistence is that Plaintiffs' claims do not concern "all" aspects of § 1024.41. As noted above, Plaintiffs have two surviving claims, one under § 1024.41(b)(1) challenging Bank of America's "reasonable diligence" in sending IINs to help them complete their loss mitigation application, and a second under § 1024.41(b)(2)(i)(B) complaining that the IINs asked them to re-send documents they had already submitted. Accordingly, Bank of America has produced relevant compliance testing documents regarding its processes for sending IINs and complying with §§ 1024.41(b)(1) and (b)(2)(i)(B). Claims by Plaintiffs rooted in other provisions of the regulation were dismissed by this Court. By demanding documents regarding "all" aspects of § 1024.41 despite the fact that their claims relate to only

5

> two discrete provisions of the regulation, Plaintiffs are literally moving to compel discovery relevant only to claims which are not before the Court and which will never be before the Court, because they were already dismissed.
>
> This is obviously improper, and Plaintiffs cannot justify this by pointing to the case's status as a putative class action. The essence of a class action is that the named plaintiffs' claims must be representative of the class. Plaintiffs cannot represent other borrowers on claims that Plaintiffs themselves don't have. This is black-letter law. The Supreme Court confirmed in *Wal-Mart Stores, Inc. v. Dukes* that class claims are "effectively limit[ed] to those fairly encompasse by the named plaintiff's claims" and that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury. *This does not mean merely that they have all suffered a violation of the same provision of law.*" It follows that discovery into claims not "fairly encompassed by the named plaintiff's claims" is also improper. There is no basis to compel Bank of America to produce information relevant only to claims that are not before the Court.

(Dkt. No. 40 at 7–8.) The Jacksons deny that the Bank has produced thousands of pages of compliance testing documents, let alone anything meaningful regarding compliance testing:

> BOFA opens its brief by arguing that there is "no dispute" as to the first category of documents at issue, namely, reports of testing of BOFA's compliance with 12 C.F.R. § 1024.41. Opp. at 1. BOFA asserts that it previously "agreed to produce these documents" and that it "has just produced several thousand pages of them." *Id.* Each of those statements is demonstrably false. To start with the easy one: BOFA has not produced "several thousand pages" of compliance-testing reports; rather, the day before it filed its opposition brief, BOFA produced four spreadsheets that appear to contain compliance-testing results, and three other pages that appear to contain testing results copied and pasted from a larger document that BOFA has not produced. *See* Declaration of Jonathan K. Tycko In Support Of Plaintiffs' Reply Brief at Exhs. A–H. Those *seven, incomplete documents* are the only documents BOFA has produced that fall within the category of documents at issue in Plaintiffs' Motion to Compel.

(Dkt. No. 45 at 3.) The Jacksons further reject any argument that the outcome of the motion to dismiss limits the scope of their discovery requests:

> BOFA's other rationale for refusing to produce complete results of testing for compliance with 12 C.F.R. § 1024.41 is an improper use of the discovery process to prematurely limit the scope of Plaintiffs' proposed class. BOFA argues that it need produce only compliance testing reports that relate to its compliance with two subparts of the applicable regulation, on the theory that "[c]laims by Plaintiffs rooted in other provisions of the regulation were dismissed by this Court." Opp. at 8. That is plainly incorrect. Plaintiffs are entitled to obtain discovery that they need to

6

support certification of the class that they seek to represent, as alleged in Plaintiffs' complaint. That class includes borrowers who were impacted by BOFA's violations of other subparts of 12 C.F.R. § 1024.41, which is a unitary regulation governing BOFA's processing of loss mitigation applications.

In ruling on the BOFA's motion to dismiss, the Court concluded that, given the particular history of Plaintiffs' interactions with BOFA, Plaintiffs had sufficiently alleged violations of certain subparts of 12 C.F.R. §1024.41 but not others. That does not mean, however, that Plaintiffs cannot represent a class of borrowers who were impacted by other violations of that same, unitary regulation. The scope of the class that Plaintiffs can represent is not determined by Fed. R. Civ. P. 12(b)(6)—the rule that governed the motion to dismiss—but rather is determined by Fed. R. Civ. P. 23, the rule that governs class certification. Under Rule 23, "commonality" and "typicality"—the key factors that determine the scope of the class that a named-plaintiff may represent—may be found where the named-plaintiff's injuries derive "from a unitary course of conduct by a single system," which contains various different components—here, BOFA's process for handling and responding to loss mitigation applications and its compliance (or lack thereof) with 12 C.F.R. § 1024.41. *See Sykes v. Mel Harris & Assocs.*, LLC, 285 F.R.D. 279, 286-87 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).

(Dkt. No. 45 at 5–6.)

The parties also have a significant disagreement over the production of email messages. As a supplement to the production of other documents, the Jacksons want the Bank to search its computer systems for email messages that might show employees discussing compliance with 12 C.F.R. § 1024.41. The Jacksons proposed search terms that the Bank could use across employees and email servers to identify potentially responsive messages. The Jacksons put a lot of weight on an email search because they believe that responsive messages would go a long way toward demonstrating the Bank's awareness of regulatory violations:

> Plaintiffs expect that emails collected from the records of custodians responsible for compliance with 12 C.F.R. § 1024.41 will reflect whether and to what extent BOFA was out of compliance with § 1024.41 during the relevant period; when BOFA realized it was not in compliance; how BOFA made that determination; whether and when BOFA actually implemented written compliance policies and procedures; and the scope of BOFA's pattern and practice of noncompliance, *see* 12 U.S.C. § 2605(f)(2)(B). The search terms are designed to identify emails discussing how loss mitigation applications were actually processed. Relevance for discovery

7

purposes is construed liberally, and email correspondence touching on these topics—or others deriving from the proposed search terms—is very clearly relevant and discoverable. *See, e.g., Harris v. Otis Elevator Co.*, No. 15-CV-0832-RJA-MJR, 2018 WL 1044560, at *3 (W.D.N.Y. Feb. 26, 2018) ("The 2015 amendments to the federal rules . . . did not alter the underlying concept of relevance, which is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." (quoting *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 14-cv-04394, 2016 WL 4613390 (S.D.N.Y. Aug. 31, 2016)); *In re Air Crash*, 277 F.R.D. at 255 (discussing the "liberal discovery rules").

(Dkt. No. 37-1 at 17.) The Bank opposes the proposed email searches and production for two reasons. As a practical matter, the Bank insists that its "employees don't use emails in processing loan modification requests." (Dkt. No. 40 at 5.) Instead, "business records regarding the processing of loss mitigation applications are on a specialized platform for processing loss mitigation applications—*not* in emails. The reason for this is obvious: bank employees need to refer to those records in the regular course of business, and thus they must be readily accessible in a way that emails are plainly not." (*Id.* at 13.) Because employees do not use email when processing mortgage assistant applications, the Bank objects to what it considers a broad request for discovery that is disproportionate to the value of what the Jacksons might find:

> Presently, Plaintiffs contend—groundlessly—that Bank of America "cannot meet its burden of demonstrating that Plaintiffs' requests for [] email discovery are disproportionately burdensome due to expense or otherwise." It is unclear why Plaintiffs think this, given that they are fully aware that their request covers an entire large division (one of eight) of an enterprise with over 200,000 employees. Even if one attempts to narrow the broad "mortgage servicing division" demanded by Plaintiffs to just the default-servicing space that handles loss mitigation programs, there were well over *13,000 employees* at Bank of America as of January 31, 2014 who come within the scope of Plaintiffs' demand; the number who worked at the bank at any time since then is certain to be even larger than that. Electronic discovery subject-matter experts estimate that this is likely to yield over *425 million documents* which it would cost Bank of America over *$63 million* to host and review.
>
> Plaintiffs do not even try to justify this burden, nor could they. Thirteen thousand custodians is not in the same ballpark—not even in the same universe—as what courts regard as reasonable in cases where email discovery is relevant at all (which is something else Plaintiffs have not established here—see infra Part B). For example, this Court's rules for patent litigation provide that "[e]ach requesting party

8

shall limit its email production requests to a total of *five custodians* per producing party for all such requests," and that "the requesting party shall bear all reasonable costs caused by" any excess. It is unclear why five custodians should be sufficient in other complex litigation, but this case somehow imposes a need to search over 13,000 custodians. Courts in this Circuit have rejected demands for emails of as few as "*eight* individuals" as "far exceed[ing] the scope of permissible discovery." It goes without saying that expanding that number into the realm of *thousands* is even more improper.

(Dkt. No. 40 at 10–11.) In the Bank's view, "[t]he reason Plaintiffs evidently regard the discovery they have already received as inadequate is that it wholly fails to contain the smoking gun Plaintiffs were hoping to find. Plaintiffs simply presumed, without any supporting evidence, that Bank of America 'was out of compliance with § 1024.41 during the relevant period' and thus an email search would reflect such things as 'when BOFA realized it was not in compliance' and 'the scope of [the purported] pattern and practice of noncompliance.'" (Dkt. No. 40 at 14.)

## III. DISCUSSION

### A. Motions to compel generally

The general principles governing management of discovery and motions to compel are well-known. The Court has wide discretion to conduct discovery in ways that help bring about the efficient administration of justice. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004) (citing *Am. Savings Bank, FSB v. UBS PaineWebber, Inc. (In re Fitch, Inc.)*, 330 F.3d 104, 108 (2d Cir. 2003)). The 2015 amendments to the Federal Rules of Civil Procedure emphasized the need to focus on proportionality. Considerations of proportionality can include reviewing whether discovery production will reach a point of diminishing returns. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) ("Rule 26(b)(1)'s proportionality requirement means [that a document's] 'marginal utility' must also be considered.") (citations omitted); *Updike v. Clackamas County*, No. 3:15-CV-00723-SI, 2016 WL 111424, at *1 (D. Or. Jan. 11, 2016) ("There is a tension, however, among the objectives of Rule 1.

9

As more discovery is obtained, more is learned. But at some point, discovery yields only diminishing returns and increasing expenses. In addition, as more discovery is taken, the greater the delay in resolving the dispute. Finding a just and appropriate balance is the goal, and it is one of the key responsibilities of the court in managing a case before trial to assist the parties in achieving that balance.").

**B. Certification-related discovery in potential class-action cases**

Rule 23 governs class actions, and Rule 23(d)(1)(A) and (E) implicitly work in tandem with Rule 26 to give the Court authority to manage procedural matters such as certification-related discovery. Allowing an appropriate amount of discovery prior to an expected certification motion is critical to managing a potential class action. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("Class certification motions are not subject to the same standards as motions for dismissal for failure to state a claim or for summary judgment. On the other hand, there can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied.") (citations omitted). Courts have been faulted for insufficient investigation of cases before making decisions about certification. *See id.* at 571 ("Indeed a district court may be reversed for premature certification if it has failed to develop a sufficient evidentiary record from which to conclude that the requirements of numerosity, typicality, commonality of question, and adequacy of representation have been met.") (citation omitted). At the same time, courts have to respect that class actions are supposed to be unusual in federal litigation. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same

interest and suffer the same injury as the class members. Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) (internal quotation marks and citations omitted); *see also* Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009) ("Any competently crafted class complaint literally raises common 'questions.' What matters to class certification, however, is not the raising of common 'questions'—even in droves—but, rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.").

With these principles in mind, courts have some guidance that they can use when shaping the contours of discovery specifically for anticipated certification motions. Courts should permit enough discovery to allow them to resolve factual disputes and to find any facts needed to determine whether each Rule 23 requirement can be met. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007); *Nat'l Org. for Women, Farmington Valley Chapter v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D. Conn. 1980) ("The discovery permitted must be sufficiently broad in order that the plaintiffs have a realistic opportunity to meet these requirements; at the same time, the defendant must be protected from discovery which is overly burdensome, irrelevant, or which invades privileged or confidential areas. Discovery is not to be used as a weapon, nor must discovery on the merits be completed precedent to class certification.") (citation omitted). Courts can permit discovery that allows plaintiffs to determine the number of people who might be affected by a

11

corporate practice.  *Cf. Noye v. Yale Assocs.*, Inc., No. 1:15-CV-2253, 2017 WL 2813293, at *3 (M.D. Pa. June 29, 2017) (ordering a response to an interrogatory asking for the number of people nationwide who were subject to a certain consumer report).  Depositions, including expert depositions, are permitted, though courts have discretion to limit the number of depositions.  *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 234 (2d Cir. 2006), *overruled in part on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). Discovery, including document production, is permitted when it helps show the nature of a business operation and the adequacy of class representation.  *See E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403–04 (1977) ("The District Court found upon abundant evidence that these plaintiffs lacked the qualifications to be hired as line drivers.  Thus, they could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore simply not eligible to represent a class of persons who did allegedly suffer injury."); *Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978).  Corporate records such as organizational charts, job descriptions, internal policies, and personnel manuals can be discoverable if they help identify a potential class through factual information without revealing evaluative analysis.  *See Sperry*, 88 F.R.D. at 278–79; *but cf. Mazzella v. RCA Glob. Commc'ns, Inc.*, No. 83 CIV. 3716 (WCC), 1984 WL 55541, at *5 (S.D.N.Y. Mar. 28, 1984) ("[P]laintiffs must be permitted to obtain information sufficient to enable them to prove employment discrimination where such discrimination exists.  To the extent that the defense of 'self-critical analysis' conflicts with a plaintiff's ability to gather information necessary to prove his or her case, the recognition of such a defense hampers the enforcement of federal equal employment laws.  In view of the strong countervailing policies extant here, we believe that it is necessary to limit carefully the situations in which 'self-critical analysis' may be raised as a justification for resisting discovery.").

### C. Discovery needed here for potential class certification

With all of the above information and authorities available for review, the Court now will employ a stepwise approach based on the few points where the parties appear to have some common ground. *Cf. Avillan v. Digital Equip. Corp.*, No. 91 CIV. 8594 (LBS), 1994 WL 198771, at *7 (S.D.N.Y. May 17, 1994) (devising a custom arrangement for document production). First, the Court will try to split the difference regarding how closely any certification-related discovery has to be tethered to the Jacksons' surviving claim. The Court agrees generally with the Bank that the Jacksons have to focus on the claim that survived the motion to dismiss—that the Bank mishandled the Jacksons' January 2014 application for mortgage assistance, violating the requirement in 12 C.F.R. § 1024.41(b) that an assessment of missing documents and information occur quickly. At the same time, the Jacksons are correct that if a single, uniform approach to mortgage assistance applications also spawned other violations then an artificial splitting of that uniform approach would be unnecessary. *Cf. Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) ("Insofar as the deficiencies of the child welfare system stem from central and systemic failures, the district court did not abuse its discretion in certifying a 23(b)(2) class at this stage of the litigation."); *accord Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014); *Karen L. ex rel. Jane L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94, 101 (D. Conn. 2001). Consequently, to the extent that it has not done so already, the Bank must furnish the Jacksons with policies, procedures, and training materials concerning how to process mortgage assistance applications. The Bank additionally must furnish policies, procedures, and training materials concerning how it tests compliance with Section 1024.41. Unless Section 1024.41(b) had its own distinct procedures and compliance testing, the above processing and testing materials must cover all of Section 1024.41. The Bank also must furnish any reports, presentations, or memoranda that it generated from 2014 through 2017 that summarize or discuss the results of

compliance testing for Section 1024.41. The Court can consider at a later time whether and how the results of this document production might affect the Jacksons' ability to establish typicality.

Next, the Court will remind the parties that certification-related discovery aims to identify the scope of a potential class and not to assess liability. Peeking ahead to the merits of a case is permitted to the extent that plaintiffs need to do so to address the prerequisites for class certification. *See Wal-Mart*, 564 U.S. at 351 (citations omitted). Here, the Court currently has two reasons to believe that the proposed email production needs to be modified before it will help the Jacksons identify the scope of a potential class. The Bank has asserted unequivocally that it does not use email for the official processing of mortgage assistance applications. If the assertion turns out to be false then the Court can consider appropriate consequences. If the assertion holds true, though, then email messages likely will not help establish numerosity, typicality, commonality of question, and adequacy of representation. The Jacksons more or less have admitted as much. As the Court quoted above, the Jacksons want email messages to try to show when the Bank realized that it was not in compliance with Section 1024.41. Whether the Bank knew about regulatory violations and persisted with defective procedures is a merits question that would help establish liability and damages. That merits question would do little if anything to inform the parties who was affected by any regulatory violations.

Consequently, and after considering the other requests in the pending motion, the Court will direct three other forms of discovery that will unfold incrementally as needed. For the calendar years 2014 through 2017, the Bank will furnish the Jacksons with copies of the complete files for the first 100 mortgage assistance applications submitted each year. Subject to later requests for modification, the entire contents of the 400 sample files will be marked as "confidential information" and will be handled in accordance with the protective order. Production of the sample

14

files should give the Jacksons some guidance as to how routinely any regulatory violations occurred; the routine or sporadic nature of any violations, in turn, will help the Jacksons decide whether any potential class should cover any applicants for mortgage assistance or should be defined more carefully. For any current or former employee whose name appears anywhere in the sample files, the Bank will search the email accounts for those employees for any mention of 1) the names of the applicants; or 2) the principal word or words in the addresses of the properties subject to the mortgage obligations. That email search should suffice to give the parties some idea as to whether Bank employees in fact were processing mortgage assistance applications by email, outside of official procedure and contrary to the Bank's assertions.

All of the document discovery described above must conclude on or before September 28, 2018.

Finally, the parties' motion papers make reference to 63 employees of the Bank who apparently had supervisory or managerial responsibility over compliance testing. (*See* Dkt. No. 45 at 10.) On or before October 19, 2018, the parties will confer with the mediator, Judge Legg (Dkt. No. 29), to pick five of those employees for depositions that must conclude on or before December 7, 2018.

The Court has set a status conference for December 12, 2018 at 2:00 PM to follow up on the outcome of the directed discovery.

## IV. CONCLUSION

The Court grants the Jacksons' motion (Dkt. No. 37) in part to direct the discovery described above. The Court denies the motion to the extent that it seeks any other relief.

SO ORDERED.

_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: July 12, 2018